# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JEANETTE JONES, | : | |
|     Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 3:10-cv-476 (CFD) |
| MICHAEL J. ASTRUE, | : | |
| COMMISSIONER, | : | |
| SOCIAL SECURITY ADMINISTRATION, | : | |
|     Defendant. | : | |

## RULING ON SOCIAL SECURITY APPEAL

The plaintiff, Jeanette Jones, filed this action seeking review of the final decision of the defendant, Michael J. Astrue, Commissioner of the Social Security Administration ("Commissioner"), denying her application for supplemental security income. The plaintiff has filed a motion to reverse the Commissioner's decision and to remand the case [Dkt. #7], and the Commissioner has filed a motion to affirm [Dkt. #10]. For the reasons given below, the plaintiff's motion to reverse and to remand is denied, and the Commissioner's motion to affirm is granted.

**I.**     **Administrative Proceedings**

The plaintiff alleged that she became disabled on October 18, 2007, at age 52. [Tr. 187, 189] After her application for supplemental security income was denied, she requested a hearing before an Administrative Law Judge ("ALJ"). [Tr. 45] ALJ Ronald J. Thomas held a hearing, which consisted of testimony by the plaintiff, on September 8, 2009. [Tr. 21-35] The ALJ then issued his decision on November 3, 2009, finding that the plaintiff was not disabled and therefore not entitled to supplemental security income. [Tr. 1-13]

The ALJ applies a five-step sequential evaluation process to an application for supplemental security income. First, the ALJ determines whether the claimant is performing substantial gainful work activity. 20 C.F.R. § 416.920(a)(4)(i). If the claimant is not performing such activity, the ALJ proceeds to the second step to determine whether the claimant has a severe medically determinable physical or mental impairment or combination of impairments. § 416.920(a)(4)(ii). The impairment must be expected to result in death or must last or be expected to last for a continuous period of at least twelve months. § 416.909. If the claimant has a severe impairment, the ALJ proceeds to the third step to determine whether the impairment meets or equals an impairment listed in appendix 1 of the applicable regulations. § 416.920 (a)(4)(iii). If the claimant's impairment meets or equals a listed impairment, the claimant is disabled.

If the claimant does not have a listed impairment, the ALJ proceeds to the fourth step to determine whether the claimant has the residual functional capacity ("RFC") to perform her past relevant work. § 416.920(a)(4)(iv). RFC is defined as the most that a claimant can do despite the physical and mental limitations that affect what she can do in a work setting. § 416.945 (a)(1). If the claimant's RFC indicates that she cannot perform her past relevant work, the ALJ proceeds to the fifth step to determine whether the claimant can perform any other work available in the national economy in light of her RFC, age, education, and work experience. § 416.920(a)(4)(v). The claimant is entitled to supplemental security income if she is unable to perform other such work. The claimant bears the burden of proof as to the first four steps, while the Commissioner bears the burden of proof as to the fifth step. Kohler v. Astrue, 546 F.3d

260, 265 (2d Cir. 2008).

In the present case, the ALJ determined that the plaintiff was not performing substantial gainful activity and had the severe impairments of "degenerative disk disease with disk herniation, and lumbar spinal canal stenosis." [Tr. 6-7] The ALJ then determined that the plaintiff did not have an impairment or combination of impairments that met or medically equaled any of the listed impairments. [Tr. 7] The ALJ found that the plaintiff had the RFC "to perform light work . . . except no more than occasional bending, stooping, twisting, squatting, kneeling, crawling, climbing, and balancing." [Tr. 7-11] The ALJ determined that the plaintiff could not perform her past relevant work as a certified nurse's assistant but could perform other jobs that exist in significant numbers in the national economy. [Tr. 11-12] The ALJ accordingly concluded that the plaintiff was not disabled. [Tr. 12]

The Commissioner's Decision Review Board selected the plaintiff's claim for review but then notified her on February 22, 2010 that it had failed to complete its review of the ALJ's decision within the required ninety days. [Tr. 14-16] The ALJ's decision thus became final, and the plaintiff then filed the present case.

II. **Standard of Review**

Following the denial of a supplemental security income claim, "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g); see also id.

§ 1383(c)(3).

"A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error. . . . Substantial evidence means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008). "Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (citing Schauer v. Schweiker, 675 F.2d 55, 57 (2d Cir. 1982)).

## III.     Discussion

In the present case, the plaintiff argues that the ALJ improperly (1) weighed the medical opinions, (2) assessed her credibility, and (3) gave insufficient consideration to her obesity.

### A.     The ALJ's Evaluation of the Medical Opinions

The plaintiff first challenges the weight that the ALJ gave to the medical opinions, beginning with the multiple impairment questionnaire completed by her treating physician, Dr. Violet Popov, on February 6, 2009. [Tr. 240-47] Dr. Popov indicated that she treated the plaintiff every one to two months and that the plaintiff's back pain radiated to her right thigh, knee, and ankle. [Tr. 240-41] Dr. Popov estimated that the plaintiff suffered from moderately severe pain and fatigue, rating those symptoms as an eight on a scale of one to ten, with ten being severe. [Tr. 242] Dr. Popov also estimated that the plaintiff could sit for two hours and stand or walk for up to one hour in

an eight-hour workday. [Tr. 242] According to Dr. Popov, the plaintiff would need to get up and move around for five minutes once every thirty minutes. [Tr. 242-43] She would also have to take an unscheduled five-minute rest break every hour. [Tr. 245]

Dr. Popov reported that the plaintiff could occasionally lift and carry up to twenty pounds and did not have any significant limitations in doing repetitive reaching, handling, fingering, or lifting. [Tr. 243] The plaintiff had minimal limitation using her upper extremities for grasping, turning, or twisting objects, and using her fingers or hands for fine manipulations. [Tr. 243-44] She had minimal limitation in using her right arm for reaching and moderate limitation in using her left arm for reaching. [Tr. 244] Dr. Popov determined that the plaintiff's condition interfered with her ability to keep her neck in a constant position, and so she would not be able to perform a full-time competitive job requiring that activity on a sustained basis. [Tr. 244-45] She also needed to avoid heights and was restricted from pushing, pulling, kneeling, bending, and stooping. [Tr. 246] Dr. Popov opined that the plaintiff's symptoms would likely increase in a competitive work environment, and her pain, fatigue, or other symptoms would periodically interfere with her attention and concentration. [Tr. 244-45] She was likely to have "good days" and "bad days" and to be absent from work more than three times per month as result of her impairments or treatment. [Tr. 246] Dr. Popov determined that the plaintiff was not a malingerer and was capable of tolerating moderate work stress. [Tr. 245]

The ALJ gave "little weight" to the questionnaire on the ground that Dr. Popov did not refer to objective clinical evidence, instead "appear[ing] to rely almost exclusively on the [plaintiff's] subjective reports of pain . . . ." [Tr. 9-10] The ALJ determined that the

questionnaire was "largely inconsistent" with all of the other evidence. [Tr. 11] The ALJ also noted that Dr. Popov is a general practitioner rather than an orthopedist, and the plaintiff received no treatment from an orthopedist other than having had magnetic resonance imaging (MRI) performed. [Tr. 11]

The plaintiff argues that the ALJ failed to follow the treating physician rule when he weighed Dr. Popov's questionnaire. The treating physician rule generally directs the ALJ to "give more weight to opinions from [the plaintiff's] treating sources . . . . If [the ALJ] find[s] that a treating source's opinion . . . is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, [the ALJ] will give it controlling weight. When [the ALJ does] not give the treating source's opinion controlling weight, [the ALJ considers several] factors . . . in determining the weight to give the opinion." 20 C.F.R. § 416.927(d)(2). Those factors are (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, (3) whether the opinion is supported by relevant evidence such as medical signs and laboratory findings, (4) whether the opinion is consistent with the entire record, (5) whether the treating source is a specialist in the relevant area, and (6) any other factors that support or contradict the opinion. §§ 416.927(d)(2)(i) through (d)(6).

In the present case, the Commissioner acknowledges that the ALJ was incorrect in stating that Dr. Popov's questionnaire failed to mention objective clinical evidence. The questionnaire cited the plaintiff's MRI and straight leg raise test, which reveals whether lower back pain is caused by a herniated disk. [Tr. 240-41] The plaintiff acknowledges that it was proper for the ALJ to consider Dr. Popov's lack of

specialization and the plaintiff's lack of treatment by an orthopedist.  The Court therefore turns to the remaining reason cited by the ALJ for assigning little weight to Dr. Popov's questionnaire — its inconsistency with all of the other evidence.  The plaintiff contends that the questionnaire was consistent with reports by Dr. Ester Rawner and Dr. Mustapha Kemal.  Although the record contains a contrary assessment by Dr. Maria Lorenzo, the plaintiff argues that the evidence submitted by Dr. Popov, Dr. Rawner, and Dr. Kemal outweighed Dr. Lorenzo's assessment.

Dr. Rawner examined the plaintiff on January 22, 2008.  [Tr. 201-02]  The plaintiff told Dr. Rawner that her lower back pain had worsened in the preceding months and that it radiated up her spine but not to her legs.  [Tr. 201]  However, she had "intermittent weakness of her right leg at the hip when the back pain [was] very severe." [Tr. 201]  Dr. Rawner found that the plaintiff "was able to get up from a seated position with moderate struggling, using her hands mostly to get her up."  [Tr. 202]  She was able "to bend at 75 degrees to touch her toes" but was "very slow to get up" and could not remove her socks.  [Tr. 202]  She had decreased range of motion in her spine and a "waddle gait."  [Tr. 202]  Dr. Rawner suggested that the plaintiff would benefit from using a cane.  [Tr. 202]

Dr. Kemal evaluated the plaintiff on October 30, 2008.  [Tr. 249-52]  The plaintiff told Dr. Kemal that her lower back pain had worsened in the preceding months, but she did not know of any precipitating event.  [Tr. 249]  She stated that the pain was exacerbated by "prolonged sitting or ambulation, increased repetitive motion, going up and down stairs, [and] getting in and out of a chair, sofa, or car . . . ."  [Tr. 249]  Dr. Kemal reported that the plaintiff's pain was "variable in nature and intensity" and that

the plaintiff had "a relatively constant, dull, achy sensation with intermittent sharp pain." [Tr. 249] Despite those symptoms, the plaintiff had only "a short course of physical therapy and no further evaluations or treatments" before seeing Dr. Kemal. [Tr. 249] Dr. Kemal found that the plaintiff was in "mild to moderate distress as a result of her symptoms" and that her lower back pain was attributable to her obesity, degenerative disk disease, and joint disease. [Tr. 251] Dr. Kemal recommended physical and aquatic therapy and additional medication. [Tr. 252]

Dr. Lorenzo, a medical consultant, completed a physical RFC assessment of the plaintiff on July 21, 2008. [Tr. 210-17] Dr. Lorenzo determined that the plaintiff could occasionally lift or carry up to 50 pounds and frequently lift or carry up to 25 pounds. [Tr. 211] Dr. Lorenzo also found that the plaintiff could stand, walk, or sit for about six hours in an eight-hour workday. [Tr. 211] Dr. Lorenzo opined that the plaintiff had unlimited ability to push or to pull; frequently balance, stoop, kneel, crouch, and crawl; and occasionally climb a ramp or stairs but never a ladder, rope, or scaffold. [Tr. 211-12] Dr. Lorenzo did not find any manipulative, visual, communicative, or environmental limitations. [Tr. 213-14] The ALJ gave Dr. Lorenzo's assessment "great weight" because it was not inconsistent with the evidence, except for Dr. Popov's questionnaire. [Tr. 11]

Comparing Dr. Popov's questionnaire with Dr. Lorenzo's assessment, it is clear that Dr. Popov judged the plaintiff to be more limited than Dr. Lorenzo. Dr. Popov indicated that the plaintiff could occasionally lift or carry up to 20 pounds, while Dr. Lorenzo raised the limit to 50 pounds. [Tr. 211, 243] Dr. Popov estimated that the plaintiff could sit for two hours and stand or walk for up to one hour in an eight-hour

workday, while Dr. Lorenzo raised the limit for sitting, standing, or walking to about six hours. [Tr. 211, 242] Dr. Popov reported that the plaintiff was restricted from pushing, pulling, kneeling, and stooping, but Dr. Lorenzo determined that the plaintiff had unlimited ability to push or to pull and could frequently kneel and stoop. [Tr. 211-12, 246] Dr. Popov characterized the plaintiff's pain and fatigue as moderately severe and predicted that the plaintiff's symptoms were likely to increase in a competitive work environment, to interfere periodically with her attention and concentration, and to cause her to be absent more than three times per month. [Tr. 242, 244-46] Dr. Lorenzo did not make those predictions.

The reports by Dr. Rawner and Dr. Kemal do not support the greater limitations described by Dr. Popov. Dr. Rawner found that the plaintiff had some difficulty getting up after sitting and bending, but Dr. Rawner did not opine that the plaintiff was restricted to the degree found by Dr. Popov. [Tr. 202] Dr. Kemal reported that the plaintiff was in "mild to moderate distress as a result of her symptoms" and noted that she had only "a short course of physical therapy and no further evaluations or treatments" before seeing Dr. Kemal. [Tr. 249, 251] The reports by Dr. Rawner and Dr. Kemal are more consistent with the assessment of Dr. Lorenzo. The Commissioner further points out that despite Dr. Popov's status as a treating physician, the record contains evidence of only three appointments with the plaintiff separated by six-month intervals rather than the one or two months that Dr. Popov reported. [Tr. 207, 231, 240, 262] This inconsistency adds to the substantial evidence that Dr. Popov's report was entitled to "little weight." [Tr. 11] The ALJ properly reasoned that the anomalousness of Dr. Popov's report, along with her lack of specialization, justified weighing the report

less heavily than Dr. Lorenzo's assessment.

B.   The ALJ's Assessment of the Plaintiff's Credibility

The plaintiff next argues that the ALJ improperly assessed her credibility. The ALJ is entrusted with the assessment of a witness's credibility because the ALJ has the opportunity to observe the demeanor of the witness. Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983). As to the credibility of the claimant's complaints of symptoms, the ALJ first determines whether the claimant suffers from an underlying medical impairment that could reasonably be expected to cause the alleged symptoms. 20 C.F.R. § 416.929(b). If so, the ALJ considers the objective medical evidence and other evidence of symptoms, including (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of medication taken to alleviate the symptoms; (5) treatment to relieve the symptoms, other than medication; (6) any measures the claimant has used to relieve the symptoms; and (7) other factors concerning the claimant's functional limitations and restrictions relating to the symptoms. §§ 416.929(c)(2) through (c)(3).

The ALJ must evaluate the claimant's statements about the intensity, persistence, and limiting effects of her symptoms in light of the objective medical evidence and any other evidence. § 416.929(c)(4). The ALJ must consider whether there are any inconsistencies within the claimant's statements or conflicts between the claimant's statements and the evidence. § 416.929(c)(4). When the claimant's statements are internally consistent and consistent with the evidence, there is a strong indication that the claimant is credible. Social Security Ruling (SSR) 96-7p, 1996 WL

374186, at *5-*6. The ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Id. at *4.

In determining whether the ALJ properly assessed the plaintiff's credibility in the present case, the Court first summarizes the plaintiff's testimony at the ALJ hearing. The plaintiff testified that she had an eleventh-grade education and lived with her disabled husband and eight-year-old granddaughter. [Tr. 24-25] The plaintiff reported that a spine problem caused "steady" pain in her lower back, legs, and feet. [Tr. 26-27] Although she took pain medication, she had not been hospitalized or had surgery to correct the problem. [Tr. 27] The plaintiff testified that her back pain radiated down her right leg "[a] certain amount" but not all the way to the foot. [Tr. 32] Aquatic therapy alleviated her back pain, but it returned as soon as she exited the pool. [Tr. 33-34] The plaintiff also had a problem with the bones in her left foot, causing her pain: "As soon as I start walking, it hurts. . . . I could walk like three blocks, but I have to sit down, I have to stop." [Tr. 28, 32] The plaintiff testified that she had asthma and diabetes and weighed 230 pounds. [Tr. 27-29] Her height is five feet, five inches. [Tr. 202]

As to the plaintiff's daily activities, she testified: "[W]hen I'm sitting up, I'm in pain all the time." [Tr. 29] She stated that she needed to get up or move around after about twenty minutes. [Tr. 33] She also testified: "I can't bend over to pick up nothing." [Tr. 27] When asked whether she could cook or clean, the plaintiff responded: "[M]y daughter and my sons, they come over to help me out and cook." [Tr. 29] She later

-11-

elaborated: "I can cook sometime[s] but . . . I can't take . . . my pain medicine because it make[s] me sleepy . . . ." [Tr. 30] The pain medication takes about one hour to make her feel sleepy, and she then naps for up to two hours. [Tr. 30-31] When asked whether she could go grocery shopping or do the laundry, the plaintiff responded: "My daughter and my son do it for me." [Tr. 29] The plaintiff testified that she lives in a second-floor apartment and has trouble using the stairs: "I go sideway up and come down sideway and hold the rail." [Tr. 31] When asked whether she could put on shoes, she responded: "I have shoes where I can just slip my feet in there." [Tr. 31] The plaintiff also noted a problem taking care of her personal hygiene: "I have a problem with taking a bath; sometime[s] I have to get help." [Tr. 31]

In addition to her testimony, the plaintiff completed an activities of daily living report on April 10, 2008. [Tr. 153-60] She explained that she dresses her granddaughter, takes her to the bus stop, and goes to her own physical therapy appointment. [Tr. 153] The plaintiff's son and daughter visit to help clean, do laundry, cook "most of the time," and bathe her granddaughter. [Tr. 153-54, 156] The plaintiff indicated that she makes sandwiches, watches television and reads two days per week, and has no problem taking care of her personal hygiene. [Tr. 154-55, 157] She goes outside every day, but she does not have a driver's license and no longer visits people. [Tr. 156, 158] She goes grocery shopping once per month and goes to doctor appointments once per month or every other month. [Tr. 157-58] The plaintiff reported "sometimes" having foot pain and trouble walking. [Tr. 155] Although she can walk one block, she needs to sit down to rest for "five to ten minutes depend[ing] on the pain." [Tr. 158-59] She does not lift because it is hard for her to bend. [Tr. 158] The plaintiff

indicated that other abilities affected by her condition are squatting, standing, and kneeling. [Tr. 158] In the "remarks" section of the report, the plaintiff wrote: "This disability has really affected my life because I was a full time student . . . to become a patient care [associate] and it has stop[ped] me from achieving my goal." [Tr. 160]

The ALJ found that the plaintiff was not entirely credible because she had repeatedly contradicted herself and her statements were inconsistent with the evidence. [Tr. 8] The plaintiff told Dr. Popov that her back pain radiated to her right thigh, knee, and ankle, while she told Dr. Rawner that her back pain radiated up her spine but not to her legs. [Tr. 10, 201, 241] Although the plaintiff told Dr. Kemal that her pain had worsened, she continued taking medication only and failed to seek more aggressive treatment. [Tr. 9, 249] The ALJ explained that there was no evidence that the plaintiff needed more invasive treatment, such as surgery or epidural injections. [Tr. 9] The plaintiff pursued Dr. Kemal's recommendation of aquatic therapy, but the physical therapist reported that the plaintiff missed eleven of the sixteen appointments "due to being ill, [having a] death in [the] family, forgetting to arrange transportation, [and] coming at [the] wrong time." [Tr. 9, 256] The plaintiff missed those appointments even though she claimed that aquatic therapy alleviated her back pain. [Tr. 33-34, 256] The therapist noted on November 13, 2008 that the plaintiff was able to put on and take off her own socks and shoes, while the plaintiff had been unable to do that during Dr. Rawner's examination on January 22, 2008. [Tr. 9, 202, 253] The therapist also observed the plaintiff ascend and descend stairs normally, but the plaintiff testified at the ALJ hearing that she had difficulty using stairs. [Tr. 31, 256] Despite the plaintiff's testimony of constant pain, her activities of daily living report indicated that she had

trouble walking only sometimes.  [Tr. 8, 28, 155]  Her report also indicated no problem with personal care, but she testified that she sometimes needed help bathing.  [Tr. 8, 31, 154]  Finally, the ALJ contrasted the plaintiff's statements that she goes only to doctor appointments once per month or every other month and that she "goes out every day, shops for groceries and other items, and does not need anyone to accompany her," as the ALJ summarized it.  [Tr. 8]

The Court determines that the ALJ's credibility analysis is supported by the record except for the ALJ's summary regarding "where the plaintiff goes."  That summary was based on the following information given by the plaintiff on her activities of daily living report:  She goes "outside" every day, is able to "go out alone," cannot drive, rides in a car "[w]hen going out," shops for groceries once per month, and gets help from her family if she needs to "go places."  [Tr. 156-58]  The best interpretation of that information is that the plaintiff is physically capable of leaving her apartment on her own each day but relies on her family to drive her places, such as the grocery store once per month.  The information given by the plaintiff on the activities of daily living report does not necessarily suggest the greater level of activity that the ALJ summarized as "go[ing] out every day, shop[ping] for groceries and other items, and . . . not need[ing] anyone to accompany her."  [Tr. 8]  However, this one instance of expansively interpreting the plaintiff's responses does not significantly detract from the ALJ's overall credibility analysis.  The ALJ properly cited numerous inconsistencies casting doubt on the plaintiff's credibility.

  C. <u>The ALJ's Consideration of the Plaintiff's Obesity</u>

The plaintiff's last argument is that the ALJ insufficiently examined her obesity.

-14-

The ALJ stated in his decision that he "considered the [plaintiff's] obesity . . . and the exacerbating effect it has on her ability to function, move, and do sustained work-related activities on a regular and continuous basis. The [RFC finding] takes into account any effect that the [plaintiff's] obesity has on these functional abilities . . . ." [Tr. 10] The ALJ did not further discuss the plaintiff's obesity. The plaintiff now contends that the ALJ should have found her obesity to be a severe impairment and made findings as to its effect on her other impairments, especially because Dr. Kemal noted that obesity was one of three factors contributing to the plaintiff's lower back pain. [Tr. 251]

As the Commissioner notes, however, the plaintiff did not allege in her application that obesity was one of her impairments. Although some of the medical records referred to the plaintiff's weight, none of them indicated that her weight significantly impacted her ability to work. Dr. Kemal found that the plaintiff's lower back pain was attributable to her degenerative disk disease and joint disease, besides obesity. [Tr. 251] The plaintiff now chooses to focus on obesity, but she does not take issue with the lack of discussion of joint disease in the ALJ's decision. She also does not challenge the ALJ's finding that her asthma, diabetes, and hypertension — conditions that are all potentially caused by obesity — were not severe impairments. [Tr. 7] The ALJ explicitly took the plaintiff's obesity into account. In view of the absence of evidence that the plaintiff's obesity was a severe impairment or had a substantial effect on her other impairments, the Court concludes that the ALJ adequately considered it.

## IV. CONCLUSION

The plaintiff's motion to reverse and to remand [Dkt. #7] is DENIED, and the Commissioner's motion to affirm [Dkt. #10] is GRANTED. The Clerk is directed to close this case.

**SO ORDERED.**

Dated this 28th day of January, 2011, at Hartford, Connecticut.

/s/ Christopher F. Droney
CHRISTOPHER F. DRONEY
UNITED STATES DISTRICT JUDGE